**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IDRISS K. BYRD** | **CIVIL ACTION** |
| **v.** | **NO. 19-cv-5305** |
| **PHILADELPHIA GAS WORKS** | |

<u>**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                    December 10, 2021

## I.     <u>Introduction</u>

Defendant, Philadelphia Gas Works ("PGW") seeks Summary Judgment pursuant to Fed. R. Civ. P. 56(c). (Dkt. No. 22) against Plaintiff, Idriss Byrd, ("Byrd"), an African American man who brings this action against PGW, his former employer, for discrimination based on race in violation of Title VII of the Civil Rights Act of 1964.[1] the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981.

## II.     <u>Procedural History</u>

On March 12, 2019, Byrd filed his administrative complaint against PGW with the EEOC and Pennsylvania Human Relations Commission (PHRC) alleging race discrimination. Compl. ¶ 4. (Dkt. No. 1).   Upon exhausting his administrative remedies, Byrd filed a Complaint with this Court on November 12, 2019.   (Dkt. No. 6), which seeks relief against PGW for race discrimination in violation of Title VII and alleges three Counts:

        A.     Disparate Treatment (Count I)
        B.     Retaliation (Count II)
        C.     Disparate Impact (Count III).

---

[1] Byrd also references the Pennsylvania Human Relations Act and 42 U.S.C. § 1981 in his opening statement. However, neither of these statutes are referenced as Counts and Byrd has taken no actions to include those claims since PGW filed its Answer. See Dkt. 6 at p. 1.  This Court will deem these claims as functionally abandoned.

PGW answered the Complaint on January 13, 2020 (Dkt. No. 6).  After both parties engaged in discovery, this Motion for Summary Judgment followed.  (Dkt. No. 22).  This Court heard oral argument from the parties on July 1, 2021 after the present motion was fully and ably briefed by both parties. (Dkt. No. 31; 37).

###   III.   <u>Undisputed and Uncontested Facts</u>

### A.  <u>Prior Litigation</u>

Byrd previously filed an EEOC charge of discrimination against PGW in November 2015 and a related lawsuit in 2017, which resulted in a confidential settlement agreement and release on March 30, 2018.  Def. Uncontested Facts at ¶ 51-53 (Dkt. No. 22-2).  The factual allegations and evidence in support of this new Title VII claim excludes all factual allegations and references to PGW's hiring practices prior to that time. <u>See</u> Dkt. No. 16.

### B.  <u>Description of the Field Services Department</u>

There are several different managerial positions in the field services department, for which Byrd could have applied for promotions, supervisor, specialist, and work dispatcher. A brief description of these various positions will help in understanding Byrd's claims and PGW's defenses.

In 2018, Byrd filed applied for promotion to the role of Supervisor in the Field Services Department.  The Field Services Department includes both union and nonunion employees who are tasked with various emergency and routine services and repairs of gas, HVACs, and related appliances.  Supervisors (also called "Field Supervisors" or "Field Service Supervisors") are non-union managerial staff who manage a small working group of union subordinates responsible for these services.  Pl. Opp'n Summ. J. Ex. A.  The hierarchy of union positions beneath the Supervisor within the Field Services Department are as follows: Helper, Cadet, Field Service Person, D, Field

Service Person C, Field Service Person B, Field Service Person A, and Specialist. Def. Uncontested Facts ¶ 2.

Since his hire as a Helper in 2004, Byrd rose in the ranks of union positions in the Field Services Department until he reached the role of Service Person A, the second-highest union position in that department. Def. Uncontested Facts ¶ 1-3.

## C. <u>Specialist</u>

Byrd never applied to be a Specialist, the highest rank of union workers. Def. Uncontested Facts ¶ 5-6. Byrd states that he is not interested in advancing to this managerial role because he may be required to work longer hours, in addition to weekends and weeknight shifts. Plaintiff Opp'n Summ. J. at 8; Def Summ. J. Ex. 3, Byrd Tr. 4:15-45:9. Specialists are considered managers within the FSD. In addition to performing all duties required of the Serviceperson A position, Specialists perform air conditioning repair. Pl. Uncontested Facts at 8. Among other things, Specialists repair "problem" appliances that have been passed on by Field Service Persons who lack the technical expertise to handle them. Def. Uncontested Facts at ¶ 6; <u>see</u> Def. Mot. Summ. J. Ex. 5 at Barry Tr. 39:1-9; 52:11-55:1. Specialists also train personnel on newly acquired skills and service techniques, act in an advisory capacity concerning work orders, and submit training reports regarding the Field Operations Personnel working beneath them. Def. Uncontested Facts at ¶ 6; <u>see</u> Def. Summ. J. Ex. 4 (Official Job Evaluation Analysis of Specialists). By contrast, Servicepersons are not required to train personnel, act as advisors, manage staff, or report on the skill levels or deficiencies of lower-ranking personnel. Def. Mot. Summ. J. at Ex. 2 (Official Job Evaluation Analysis of Serviceperson A). Service Person A workers repair all gas appliances, excluding air-conditioning units. <u>Id.</u>

3

**D**.  **Dispatcher**

Byrd also never applied to be a Work Dispatcher, another non-union managerial role that ranks above Specialist.  While Work Dispatchers are not providing repairs in the field, they are tasked with coordinating services and repairs for upwards of eighty jobs a day.  Pl. Undisputed Facts at ¶ 13 (citing Def. Summ. J. at Delgado Tr. 144:1-7).

**E.  PGW Vacancy for Promotion to Supervisor in the Field Services Department**

In 2018, PGW solicited applications from current employees and held interviews for the role of Field Services Supervisor, a non-union managerial role at the company.  Def. Uncontested Facts at ¶ 15.  The chief duties of Field Services Supervisors include managing small groups of union employees in their inspection and maintenance work, training field employees, providing reports to senior management, and overseeing classroom training for a variety of field services skills.  Pl. Opp'n Summ. J. at Ex. A.  The Supervisor vacancy posting explicitly sought candidates exhibiting "[l]eadership skills with the ability to supervise others" and "planning and project management skills with [the] ability to make operational decisions, monitor progress, and report results."  Id. at 3.

PGW interviewed ten out of 34 applicants for the three Field Supervisor positions, including Byrd.  Def. Uncontested Facts at ¶¶ 21; 24.  Of those ten interviewees, six candidates already held managerial roles—two Work Dispatchers and four Specialists—and four held the nonmanagerial role of Service Person A.  Def. Undisputed Facts at ¶ 25.  All four Service Person A applicants, including Byrd, identify as African American. Def. Uncontested Facts at ¶ 26.

**F.  Interview Procedure and Process**

4

The interviewing panel was comprised of Manager Jose Delgado, who self-identifies as Hispanic, General Supervisor Robert Moore, who self-identifies as Caucasian, and Senior Business Partner Bonita Woodruff, who self-identifies as "Afro-American." Pl.'s Uncontested Facts at ¶ 28. (Dkt. No. 26-2). The interview process consisted of fourteen predetermined questions — ten technical knowledge questions and four behavioral questions. Def. Uncontested Facts at ¶ 29. PGW prepared for the panel "model answers" comprised of a series of bullet points identifying the factual components of the "perfect" response to each technical question. Def. Undisputed Facts at ¶ 31; see Def. Summ. J. Exs. 13-16 (question lists and interview notes for candidates). Each model answer contained three to five bullet points which the interview panel would check off during the interview process. See, e.g., Def. Summ. J. Ex. 16 (Interviewer Notes of Daniel Jones). Each candidate was assigned a numerical score based on how closely their interview answers aligned with the model answers. Def. Uncontested Facts at ¶¶ 29-33. The interview panel made collective scoring decisions for candidates when their answers did not follow the model answers precisely. Pl. Uncontested Facts at ¶ 33-38; Def. Mot. Summ. J. Ex. 7, Moore Tr. 92:13-18; Def. Mot. Summ. J. Ex. 6, Delgado Tr. at 165:21-179:21. A candidate can receive a maximum score of five points for each question. Pl. Uncontested Facts at ¶ 114.

Byrd does not dispute that he scored the second lowest of the ten interviewees. Pl. Uncontested Facts at ¶ 46; see Def. Mot. Summ. J. at Ex. 12 (Final Score Sheet for all interviewees). Though Byrd ranked higher than Fredell, a Caucasian Specialist who scored the lowest of the group, Byrd nevertheless received the lowest score of all Serviceperson A candidates. Id.

The day after Byrd interviewed for the Supervisor role, Byrd applied to be a driver in the Supply Chain Department because he had decided that he wanted to leave the Field Services Department. Def. Mot. Summ. J. Ex.3. Byrd Tr. at 114:3-9; 115:15-17; 117:21. Byrd remains

currently employed at PGW as a Driver in the Supply Chain Department. Pl. Uncontested Facts at ¶ 50.  On December 7, 2018, 16 days after Byrd had applied to the Driver position, PGW offered the Supervisor position to three other applicants: Jerry DeSimone, a White Work Dispatcher, Daniel Jones, an African American Specialist, and Eric Lopez, a Hispanic Specialist. Def. Uncontested Facts at ¶¶ 39-44; Def. Mot. Summ. J. Ex. 17-19 (offer emails to DeSimone, Jones, and Lopez).

### IV.   **Parties' Contentions**

#### i.    **PGW's Contentions**

PGW contends that there is no genuine dispute as to any material fact and it is therefore entitled to judgment as a matter of law, because, taking Plaintiff's evidence in the most favorable to Plaintiff, Plaintiff has failed to show any discrimination.   It is undisputed that Byrd possessed the minimum qualifications required for the Supervisor role.  Where the parties disagree is the extent to which certain qualifications for the job were essential, as opposed to merely desirable.  Though a candidate is not required to be a Work Dispatcher or Specialist in order to meet the minimum qualifications for the Supervisor position, PGW contends that these positions provide a wealth of managerial and supervisory experience that the interview panel considered "desirable." Def. Uncontested Facts at ¶¶ 106-108.  PGW notes that both managerial skills and "leadership skills with the ability to supervise others" were expressly detailed as qualifications on the Supervisor job posting.  Def. Mot. Summ. J. at Ex. 9. PGW notes that Byrd's application lacked any reference to managing and training other employees.  Def. Mot. Summ. J. at 6; see Ex. 11, Byrd's Application.

Drawing the distinction between essential and desired qualifications, PGW asserts that its interview panel considered HVAC experience and certifications when scoring the candidates because it was a desired qualification for the Supervisor role. Def. Uncontested Facts at ¶¶ 110-

112.  PGW further asserts that the interviewers considered air conditioning certifications if present on an applicant's resume, and that they asked each candidate for a "brief description of [their] work experience," including experience outside of PGW.  Def. Uncontested Facts at 113.  Notably, Byrd did not include any reference to his air-conditioning certification in his application or resume. See Def. Mot. Summ. J. Ex. 11, Byrd's Application.

### ii.     Plaintiff's Contentions

Byrd highlights the fact that a successful candidate for the Supervisor position is "not required to be a Specialist or Work Dispatcher, hold a management position, or have supervisory experience" but that PGW nonetheless "require[ed] Plaintiff to become a Specialist for successful promotion as a Field Supervisor." Pl. Opp'n Summ. J. at 8.  Byrd contends that PGW's "focus on these non-required" positions is "pretext for intentional discrimination against him and the other African American, black candidates selected to interview." Pl. Opp'n Summ. J. at 8.

Byrd argues that Specialists merely "do everything a Serviceperson A does plus air-conditioning," and that his skillset is akin to those of a Specialist because he has a certification to perform air-conditioning repairs and had performed such repairs for another company.  Pl. Opp'n Summ. J. at 7.  He further argues that the interview panel failed to ask Byrd about his certification to perform air-conditioning repairs. Pl. Opp'n Summ. J. at 9; 16.  Byrd argues that he would not have known to showcase this experience to the panel because HVAC repair is not specifically mentioned in the Supervisor job description.  Pl. Opp'n Summ. J. at 18. Regardless, Byrd contends that the air-conditioning experience is not required to be a successful candidate for the Supervisor position.  Pl. Opp'n Summ. J. at 16.

Turning to the interview process, Byrd asserts that PGW engaged in "subjective scoring" of portions of each candidate's interview because the panel awarded partial credit for answers that

were partially correct and used no model answers for behavioral questions.  Pl. Opp'n Summ. J at

17.  Byrd also takes issue with the fact that each interview answer was awarded a maximum of

five points even for model answers that lacked greater details.  Id.  Byrd considers this "subjective

scoring" to be an adverse employment action, attributing the panel's interviewing tactics to be the

reason Byrd and other Serviceperson applicants were denied the promotion. Pl. Opp'n Summ. J.

at 17, 23.  Byrd also contends that he was denied the position as retaliation for filing another

discrimination lawsuit against PGW in 2017,  Pl. Opp'n Summ. J. at 21-22, which concluded with

a confidential settlement agreement and release on March 30, 2018. Byrd applied for the

Supervisor position roughly nine months later.

### V.      Legal Standard

Summary judgment is proper if the movant can establish that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). If a fact "might affect the outcome of the suit under the governing

law," the factual dispute is material and will allow the nonmovant to

survive summary judgment. Id.  A grant of summary judgment is appropriate only if "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At

the summary judgment stage, the district court is obligated to "review the record as a whole and

in the light most favorable to the nonmovant, drawing reasonable inferences in its favor." In re

Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015).

It is the responsibility of the litigant seeking summary judgment to inform the district court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where the burden of proof on a particular issue rests with the nonmoving party at trial, the moving party's initial burden can be met by simply pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325. Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute. Fed. R. Civ. P. 56(c).

## VI.   <u>Discussion</u>

Byrd claims that he didn't receive the Supervisor promotion based on race discrimination under a disparate treatment theory (Count I), retaliation based on a prior Title VII case that settled approximately eight months before PGW failed to promote him (Count II), and race discrimination under a disparate impact theory (Count III). Each claim falls under the <u>McDonnell Douglas</u> burden-shifting framework. Byrd also alleges that he was constructively discharged from the Field Services Department due to the stress of the job rejection and encouragement to take a Specialist position with weekend and weeknight shifts. Pl. Opp'n Summ. J. at 20-21. As will be discussed below, no genuine issue of material facts exists for these claims.

### <u>Count I - Disparate Treatment</u>

A Title VII plaintiff may make a claim for discrimination under either the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), or the mixed-motive theory set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and

illegitimate reasons. <u>See</u> <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780, 787 (3d Cir. 2016) (quotation omitted).  Byrd relies on both theories for his disparate treatment claim.

### i.   **McDonnell Douglas Framework**

Under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, a plaintiff must first establish his prima facie case of discrimination by showing that: "(1) [he] is a member of a protected class, (2) [he] was qualified for the position [he] sought to attain or retain, (3) [he] suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." <u>Jones v. Temple Univ</u>., 622 F. App'x 131, 134 (3d Cir. 2015) (<u>citing</u> <u>Mandel v. M & Q Packing Corp</u>., 706 F.3d 157, 169 (3d Cir. 2013).  Should a plaintiff establish a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employee's actions. <u>McDonnell Douglas</u>, 411 U.S. at 802. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted, and the plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S. at 804).

### 1.  **Byrd's Prima Facie Case**

#### *Factors 1 and 2*

There is no dispute that Byrd, an African American man, is a member of a protected class for Title VII purposes.  There is likewise no dispute that Byrd possessed the minimum qualifications necessary for the role of Supervisor.  The first two factors of Byrd's prima facie case are thus satisfied.

#### *Factor 3*

10

Addressing the third prong of his prima facie case, Byrd bases his disparate treatment claim on two adverse employment actions, namely (1) PGW's "subjective scoring" of the candidates' interview questions, and (2) PGW's constructive discharge of Byrd from the Field Services Department.

Byrd claims that the three-member hiring panel scored each candidates' interview answers "subjectively" by awarding points to candidates for responses that were not included in the grading rubric, and by failing to use a grading rubric for the panel's behavioral questions. Pl. Opp'n Summ. J at 18.  The panel conferred after each interview to assess all candidates' answers and awarded partial credit for answers that the hiring team considered to be correct but not reflected in the panel's list of predetermined model answers.  Def. Summ. J. Ex. 7 Moore Tr. 92:13-18.  Byrd cites no evidence as to how he suffered an adverse employment action through the collaborative deliberations of a racially diverse and technically skilled panel of managers.  Def. Summ. J. Ex. 6 Delgado Tr. 73:21-24.

There is no evidence that partial credit was awarded in a discriminatory manner against Byrd or the other African American applicants, including the African American candidate who was ultimately offered one of three Supervisor positions.  See Def. Summ J. Ex. 12 (Jones, with the second highest score of 12.0).  Nor does Byrd proffer evidence that the partial credit was awarded in a discriminatory manner against either Hispanic applicant, including the Hispanic candidate who was also offered a Supervisor position and in fact scored highest of all ten candidates.  Id. (Lopez, with the highest score of 13.3).  Other African American candidates for the promotion scored significantly higher than Byrd despite the panel's alleged use of "subjective scoring."  The interview grading scores produced by PGW devices a wide range of scores with no discernable pattern based on race.  See generally Def. Mot. Summ. J. Ex. 12 (chart of scores); and Ex. 23 at

25-26 (chart of racial demographic of candidates).[2]  While a White Dispatcher ranked third among the ten candidates, another White candidate placed last among the entire pool.  Def. Mot. Summ. J. Ex. 12 (comparing interview scores of DeSimone to Fredell).  African American applicants scores varied across the board, with candidates placing in the top and bottom half of the pool. Id.

Byrd contends that the scoring was also "subjective" because PGW failed to ask him about his HVAC experience.  It strains credulity that Byrd would not himself state if not showcase any technical skills he had previously acquired for a highly technical managerial position that oversees all work of Field Services Department employees, including air-conditioning.  Importantly, Byrd failed to include his HVAC certification on his resume and cannot hold the interviewer accountable for his own omission.  Def. Uncontested Facts at 113; Def. Mot. Summ. J. Ex. 11, Idriss Byrd's Application (lacking any reference to HVAC certification); Def. Summ. J. Ex. 6 Delgado Tr. at 182:3-22 (noting that the interview panel looked at each candidate's resume to comprise part of their technical score).  Regardless, all candidates were asked the same set of questions and therefore had equal opportunity to showcase any and all technical skills they had acquired both within the Field Services Department and elsewhere. Def. Summ. J. Ex. 6 Delgado Tr. at 78:7-14.

In addition to contending that his interview was held improperly, Byrd argues that PGW caused him to suffer another adverse employment action in the form of constructive discharge.  Pl. Opp'n. Summ. J. at 19-21.  "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Pa. State Police v. Suders, 542 U.S. 129, 141 (2004).  This doctrine requires a Court to assess whether "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign" Id. "[A] reasonable employee will

---

[2] Byrd does not dispute the veracity of the chart or scores reflected therein, but simply contends that all African American applicants were impacted by "subjective scoring," excluding Jones, the African American Specialist.

usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993). Importantly, a plaintiff may "face a more difficult burden of proof in establishing the employer's liability, when relying on a single discriminatory incident as a basis for arguing the occurrence of constructive discharge." Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1232 (3d Cir. 1988).

Byrd argues that PGW ostensibly forced him out of his role as a serviceperson because PGW encouraged him to become a Specialist in order to improve his managerial and technical skills and increase his likelihood of eventually advancing to the Supervisor role. Pl.'s Opp'n. Summ. J. at 20; see Def. Ex. 6. Delgado Tr. at 113:1-114:16; Plaintiff's Ex. G EEOC Notice at 5. Byrd undoubtedly hoped to rise through the ranks to Supervisor without having advanced to the Specialist position with its less desirable shift schedule. There is no connection between this argument and racial discrimination, however. Byrd presents facts that PGW merely *suggested* that Byrd advance to Specialist in order to improve his chances in applying for Supervisor in the future. Byrd provides no evidence that PGW somehow forced him to leave his position as Serviceperson. In fact, Byrd applied to leave the Field Services Department on his own volition the day after his interview for the Supervisor position to become a Driver in the Supply Chain Department. Byrd Tr. at 117:3-21. Byrd obviously could not have left his position due to PGW's hiring decisions because he left the Department weeks before PGW even offered the position to the three candidates.

In short, Byrd has failed to meet factor three of his prima facie case because he has failed to cite any adverse employment action taken against him.

***Factor Four***

Byrd also fails to meet the fourth and final factor of his prima facie case. Byrd argues that an inference of discrimination can be drawn by a factfinder because he was treated differently than the one White applicant who was ultimately hired, DeSimone, who worked for PGW as a Work Dispatcher at the time of his application. Pl. Opp'n Summ. J. at 14-16. PGW argues that Byrd and DeSimone are not similarly-situated employees because DeSimone's significant HVAC and managerial experience made him more qualified for the role than Byrd. Def. Mot. Summ. J. at 13-14.

A similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in "all relevant respects." Wilcher v. Postmaster Gen., 441 Fed.App'x. 879, 882 (3d Cir.2011) —— U.S. ——, 132 S.Ct. 1645, 182 L.Ed.2d 241 (2012). Whether comparators are similarly situated is generally a question of fact for the jury, however summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated. Abdul-Latif v. Cty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) See Opsatnik, v. Norfolk S. Corp., 335 Fed.App'x. 220, 223–4 (affirming a grant of summary judgment because there was no evidence that comparators were similarly situated). "Although the identification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination, an employee who holds a different job in a different department is not similarly situated." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013).

Ultimately DeSimone is not a similarly-situated comparator to Byrd, as Dispatchers are considered managerial staff and are even higher-ranked than Specialists. Def. Mot. Summ. J. Ex. 7 Moore Tr. at 90:19-21. (Dkt. No. 36-3). As described by DeSimone, Work Dispatchers are responsible for overseeing the entirety of work assignments of one's station and act as

intermediaries between field technicians and upper management.   Def. Mot. Summ. J. Ex. 8 DeSimone Tr. at 34:4-15.   Indeed, Byrd himself concedes that Work Dispatchers are management positions within FSD.   Pl. Uncontested Facts at ¶ 9 (citing Def. Mot. Summ. J. Ex. 5 at Barry Tr. 32:9-33:16; 103:24-104:10; and Ex. 8 at Desimone Tr. 37:7-9).   Byrd specifically states that he is similar to DeSimone by virtue of the fact that they both had HVAC experience, yet he was unfairly disadvantaged because he was not asked about this experience in the interview.   This argument obviates a major point of distinction between the two candidates.   Even if Byrd had highlighted his relevant experience in HVAC repair, Byrd was still vying against seasoned managers such as DeSimone for a managerial spot in the company.   Byrd could have easily highlighted his relevant experience in HVAC repair when he was asked open-ended questions about his relevant experience, but regardless, Byrd's HVAC experience does not change the fact that he scored ninth out of ten applicants and had no managerial experience to showcase for a position that requires significant leadership skills.

### 2.   PGW's Legitimate, Non-pretextual Basis

PGW argues that it had a legitimate, non-pretextual basis for preferring DeSimone to Byrd by simple virtue of the fact that DeSimone had greater daily exposure to the breadth of technical jobs at PGW.   PGW asserts that its preference for managers such as Specialists and Work Dispatchers is a legitimate one, considering that a candidate's prior managerial experience would be attractive to a hiring committee and befit the managerial role of Supervisor.   In the alternative, PGW relies on another legitimate, non-pretextual basis for not hiring Byrd:   he did poorly in the interview, finishing second-to-last among ten interviewees.   See Smith v. Cnty. of Chester, 2013 WL 1157186 (E.D. Pa. 2013) (Dalzell, J.) (granting defendant's motion for summary judgment where the plaintiff "did not perform as well as the other candidates during the … application process").

PGW disputes Byrd's contention that the interview panel's use of partial credit somehow constituted biased or otherwise subjective scoring.  Def. Uncontested Facts at ¶ 115.

### 3.  Byrd's Burden to Show Pretext

Byrd must produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons for not promoting him are a pretext for illegal discrimination.  Byrd may meet this burden and defeat a motion for summary judgment by providing evidence that would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." Sarullo, 352 F.3d at 799–800 (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir.1999)).  Byrd can accomplish this by showing that PGW's proffered reasons are weak, incoherent, implausible, or so inconsistent that "a reasonable factfinder could rationally find them unworthy of credence." Id. (citing Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108–09 (3d Cir.1997).  Byrd can also meet this burden with evidence that "the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it could not have been the employer's real reason.'" Jones, 198 F.3d at 413 (quoting Keller, 130 F.3d at 1109).  "Pretext cannot be established based on speculation and mere conclusory allegations." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000), aff'd, 29 F. App'x 100 (3d Cir. 2002).  Where the employer asserts it hired the "best qualified" candidate, a plaintiff must show "that the defendant's selection process and criteria were filled with such inconsistencies that the employer's claim that it was seeking the 'best qualified' candidate was a sham." Boykins v. SEPTA, 722 F. App'x 148, 153 (3d Cir. 2018) (citing Bray v. Marriott Hotels, 110 F.3d 986, 999 (3d Cir. 1997)).

At the argument, the Court questioned Plaintiff's counsel at length as to which specific inconsistencies supported Plaintiff's theory of pretext.   Plaintiff asserted the following "inconsistencies" in PGW's hiring process: (1) neither Byrd nor DeSimone were Specialists before they applied to the Supervisor role and both candidates lacked supervisory experience; (2) the minimum job qualifications do not require candidates to have supervisory experience, and there exists "supervisory bootcamp" and other classes for workers as needed; (3) DeSimone required more than the average amount of training to prepare for the role of Supervisor; (4) the only difference between Byrd's role of Service Person A and the "preferred" role of Specialist is HVAC experience, which Byrd has; (5) the information from the job posting and interview questions were outdated;[3] and (6) the interviewers came up with a consensus for each candidate's overall score. (Dkt. No. 37. The Court rejects all of these assertions as insufficient.

Byrd's reliance on the Boykins decision at oral argument does not warrant a finding that Byrd has presented sufficient evidence of pretext.  See Boykins v. SEPTA, 722 F. App'x 148, 153 (3d Cir. 2018).  Even assuming, *arguendo*, that Byrd has made out a prima facie case, Byrd's proffered inconsistencies are far from inconsistent in actuality.  Byrd is correct that DeSimone has never held the position of Specialist, however PGW never stated that the role of Specialist was a requirement for this position.  Instead, Work Dispatcher candidates and Specialist candidates gathered the technical and managerial experience that would enable them to score highly on their respective interviews.  Though prior supervisory and/or managerial experience were not necessary requirements for the role, they were sufficient to show a candidate's proven track record of a

---

[3] There is one outdated element of the Supervisor job posting, but it is a simple error that evinces no inconsistency on the part of PGW's stating hiring preferences.  The qualifications section makes reference to BCCS, the old billing system that PGW used more frequently at a prior point, prior to the company's transition to, and heavier reliance on, AIMS, its current billing system.  Def. Ex. 7 Moore Tr. 95:11-96:18.  This does not alter the main characteristics of the Supervisor position and all candidates would conceivably have understood that the position's listed qualifications desired familiarity with the company's current billing system.  Byrd provides no evidence for his assertion that the interview questions were outdated.

desired skillset.  The existence of training opportunities for Supervisors does not somehow call into question PGW's preference for Supervisor candidates with a track record of managerial experience.  Furthermore, and contrary to Byrd's assertions, there exists no "average" number of hours that individuals need for training purposes.  Def. Summ. J. Ex. 6 Delgado Tr. 200:14-23. Byrd cites no evidence for the proposition that DeSimone took a significantly longer time than any other past or incoming Supervisor.[4]  Regardless, DeSimone could not begin training full time until after his prior Dispatcher position had been filled.  DeSimone Tr. at 84:15-86:23.

Though Work Dispatchers might not directly supervise workers within the Field Services Department, Desimone was well-prepared for the Supervisor position by virtue of the fact that Supervisors and Work Dispatchers share many similar duties, including coordinating services and emergency repairs, drafting monthly reports to upper-level management, handling customer issues, and crafting external incident reports for police, insurance agencies, and other individuals. Compare Pl. Opp'n Summ. J. Ex. A to Ex. B. Also, by virtue of their job duties, Work Dispatchers such as DeSimone are exposed to a wider variety of technical jobs throughout the day as compared to Field Service Persons such as Byrd.  Def. Mot. Summ, J. Ex. 6 at Delgado Tr. 143:23-24.  As such, Byrd has made no such showing that PGW's stated rationales for preferring DeSimone over Byrd to be pretextual.

Byrd considers it inconsistent that PGW prefers Specialists to Service Person A candidates for the role of Supervisor because they simply have the one additional skill of air-conditioning/HVAC repair.  Yet even a cursory review of the job descriptions for those two positions shows a marked

---

[4] DeSimone took 485 hours to train for the Supervisor role.  Pl. Opp'n Summ. J. Ex. I.  During a deposition with a retired Supervisor and Superintendent, Michael Barry, Plaintiff's counsel asked him to approximate how many days and hours of training was required of new Supervisors. Barry testified that he was "unsure" of the "exact number of days" but approximated 45 to 60 days.  Def. Summ. J. Ex. 5 Barry Tr. at 62:2-22. From there, Plaintiff's counsel extrapolated that Supervisors underwent 360 to 480 hours of training.  Id. at 63:3-7.  Even if this approximation is accurate, the additional five hours of training does not evince that DeSimone was somehow less qualified for this role than other candidates. (See Id. at 62: 2-15, describing how some of the training was "not important").

difference between these two roles.  Specialists, but not Service Persons, are considered managers within the FSD who train personnel and act in an advisory capacity for work orders.  Def. Summ. J. at Ex. 4.  Specialists have greater technical expertise, as they are tasked with repairing "problem" appliances that have been passed on by Field Service Persons who fail to handle them. Def. Uncontested Facts at ¶ 6; Def. Mot. Summ. J. Ex. 5 at Barry Tr. 39:1-9; 52:11-55:1.  PGW justifiably prefers advanced technical and managerial experience for this high-level role.

In response to PGW's legitimate non-pretextual basis for failing to promote Byrd due to his poor interview performance, Byrd argues that a portion of the interview was subjectively scored and therefore pretextual and discriminatory.  Byrd cites no authority for this proposition, however, referencing only one district court opinion dismissing a similar argument made in the ADEA context regarding a job-related test with subjective criteria.   Instead, the relevant test for determining whether an employee interview is discriminatory is whether an employer's evaluating criteria "lacks any relationship at all to the performance of the employee being evaluated because to do so would be inconsistent with and contradictory to the employer's stated purpose. Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005).   Such is not the case here.  PGW's evaluation methods consisted of a thorough evaluation of all ten candidates through the use of technical and behavioral questions that were clearly connected to the role of Supervisor and its desired qualifications.

Absent this type of violation, this Court cannot second guess the method an employer uses to evaluate its employees. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir.1998) ("Whether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide."); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.1997) ("The question is not whether the employer

made the best or even a sound business decision; it is whether the real reason is discrimination."); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir.1988) ("[O]ur inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee."); Logue v. Int'l Rehab. Assocs., Inc., 837 F.2d 150, 155 n. 5 (3d Cir.1988) ("[O]ur task is not to assess the overall fairness of [the] ... employer's actions.").

**(ii) Mixed-motive Theory**

In a mixed-motive case, a plaintiff alleges that "both legitimate and illegitimate reasons motivated" the employment decision. Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003). To prove disparate treatment under the mixed-motive theory, the plaintiff "must demonstrate—using direct or circumstantial evidence—that race was a motivating factor in the City's failure to promote" him. Boyle v. City of Philadelphia, 476 F. Supp. 3d 101, 113 (E.D. Pa. 2020) (citing Pierce v. City of Phila., No. CV 17-05539, 2018 WL 6832093, at *8 (E.D. Pa. Dec. 28, 2018)).

Byrd argues that race was a "motivating factor" in PGW's decision to "focus on specialists and managerial level candidates at the exclusion of [Byrd] and the other four Service Person A interview candidates."  Pl. Opp'n Summ. J. at 21.  Byrd's argument blatantly disregards the fact that there were Hispanic and African American managerial applicants who were ultimately offered two of the three positions.  Byrd himself characterizes PGW's preference for managerial candidates as a discrimination based on job title, not race.  Def. Summ. J. Ex. 3 at Byrd Tr. 147:9-23.  Even if the racial demographic of the nonmanagerial staff were different, it is clear that PGW "would have taken the same action in the absence of the impermissible motivating factor" Boyle v. City of Philadelphia, 476 F. Supp. at 113 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).  Byrd fails to show PGW ultimately selected its candidates based on race.  The facts show PGW acted based on the rank scores of interview performances and prior experience.  Each candidate was judged based

on their technical and behavioral answers to the same predetermined questions designed to assess the suitability of the candidates for the position.  This Court has found such evaluating processes to be legitimate and nondiscriminatory.  See, e.g., Smith v. County of Chester, No. CIV. A. 12-130, 2013 WL 1157186 (E.D. Pa. March 21, 2013) (finding interview process in which the panel interviewed multiple people and all of the candidates were asked the same questions was a legitimate evaluating criterion because it was related to the suitability of the candidates for the position).

### Count II - Retaliation

Byrd had previously filed a lawsuit against PGW in 2017.  Both parties entered into a confidential settlement and release on March 30, 2018.  Byrd argues that PGW's decision not to promote him to Supervisor was retaliatory, despite the fact that eight months had passed between the settlement and PGW's promotion decision.   The burden-shifting framework outlined in McDonnell Douglas Corp. also applies to Byrd's retaliation claims and Byrd must first establish a prima facie case of retaliation.  To do so, Byrd must show that: (1) he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the two. See Fries v. Metro. Mgmt. Corp., 293 F. Supp. 2d 498, 502 (E.D. Pa. 2003) (citing Fogelman v. Mercy Hospital, Inc., 283 F.3d 561, 567 (3d Cir. 2002)).  The parties dispute the existence of a causal link.

When establishing a causal connection between the protected activity and an adverse employment action, Title VII retaliation claims require proof that the plaintiff's participation in a protected activity constituted a but-for cause of the adverse action. See Reaves v. Pennsylvania State Police, 597 F. App'x 92, 97 (3d Cir. 2015) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517 (2013)).  Parties dispute whether there exists a significant temporal nexus between

Byrd's first lawsuit and PGW's promotion decision so as to suggest a causal link.  In absence of additional evidence, the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997); see Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir.1989) (finding that plaintiff established causation on retaliation claim merely by showing that discharge occurred just two days after filing of complaint).  That said, the "mere passage of time is not legally conclusive proof against retaliation." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997) (quoting Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir.1993)).

Though there is no bright line rule as to what constitutes "unduly suggestive" temporal proximity, the Third Circuit has determined that even smaller gaps in time have failed to establish a causal inference. See, e.g. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment); Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir.2007) (five-month gap was insufficient to raise an inference of causation).

When temporal proximity is not "unusually suggestive" of retaliatory motive, as is the case here, the Third Circuit has demanded further evidence to substantiate a causal connection. McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008); see Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.2003) (where "the temporal proximity is not so close as to be unduly suggestive ... timing plus other evidence may be an appropriate test").  Among the kinds of evidence that a plaintiff can proffer include "inconsistencies in the employer's articulated reasons" for the allegedly retaliatory action.  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232–33 (3d Cir. 2007).  Byrd characterizes

22

PGW's articulated reasons for its promotion decision as "inconsistent" because the job posting did not require applicants to have a management position, HVAC experience, or supervisory experience in order to apply for the role. Pl. Opp'n Summ. J. at 23.  Because PGW can train Supervisors on these skills, Byrd reasons that PGW's preference for managerial and technical qualifications are a mere pretext for its retaliatory failure to promote him. Id.  Byrd also considers the subjective scoring to be an inconsistency, though he fails to say how the grading rubric might conflict with PGW's stated rationale. Id.

Byrd's arguments fail for the same reasons described above.  PGW had a legitimate, non-pretextual preference for supervisory experience, a fact reflected in the job posting and interview process.  The existence of training opportunities for Supervisors does not somehow call into question PGW's preference for Supervisors with a track record of managerial experience.  See Def. Mot. Summ. J. at Ex. 12 (ranking candidates by their "time to productivity").  Importantly, Byrd submits no evidence to show that the members of the hiring committee were even aware of his prior protected activity.  Def. Mot. Summ. J. at 18.  This alone is dispositive of Byrd's claim. See Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 415 (3d. Cir. 1999) (affirming summary judgment terminating plaintiff's retaliation where plaintiff produced no evidence showing decisionmakers were aware of his previous EEOC filings); Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002) (determining that a decisionmaker's action can be deemed retaliatory only if they are aware that the protected activity took place).

## Count III - Disparate Impact

Title VII's disparate-impact provision prohibits employment practices that have the unintentional effect of discriminating based on race.  N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).  A plaintiff must first establish a prima facie case by

"demonstrat[ing] that application of a facially neutral standard has caused a 'significantly discriminatory hiring pattern." Id. To do so, a plaintiff to prove a significant statistical disparity and to "demonstrate that the disparity [he] complain[s] of is the result of one or more of the employment practices that [he is] attacking." Id.

Byrd sets forth two facially neutral employment practices that he alleges led to disparities in promotion among African American applicants: (1) the use of "subjective/discretionary scoring," such as partial points for partially correct answers, and (2) PGW's preference for Specialists and Work Dispatchers.  Pl.'s Opp'n Summ. J. at 23.

As a preliminary matter, Byrd fails to show a significant statistical disparity arising from the hiring process.  There was a 25% offer rate among White candidates, 50% offer rate among Hispanic candidates, and a 20% offer rate among African American candidates.  Def. Mot. Summ. J. at 14.  A 5% difference between White and African American offer rates is hardly a significant disparity.  In fact, Byrd himself concedes that the interviewers ultimately offered Supervisor positions to a racially diverse group of candidates.  Def. Mot. Summ. J. Ex. 3 Byrd Tr. 89:20 to 90:11.  Byrd therefore fails to meet this threshold burden and the analysis ends there. 42 U.S.C.A. § 2000e-2(k)(1)(B)(ii) ("If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.").

Even should that 5% disparity amount to a significant disparity, Byrd fails to establish a causal connection between the "subjective scoring" and the 5% disparity at issue.  Plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force—the plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or

promotions because of their membership in a protected group." <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 994-95 (1988).  Here, Byrd's "proffered evidence is far too incomplete and insubstantial to raise such an inference of causation and therefore cannot defeat summary judgment." <u>Foxworth v. Pennsylvania State Police</u>, 402 F. Supp. 2d 523, 535 (E.D. Pa. 2005), <u>aff'd,</u> 228 F. App'x 151 (3d Cir. 2007)*; see also* <u>Spence v. City of Phila.</u>, 2004 WL 1576631, at *8 (E.D.Pa. July 1, 2004) (mere proffer of statistics showing racial disparity in supervisory positions did not satisfy plaintiff's burden to establish a prima facie case under the disparate impact analysis, because plaintiff cannot show a causal connection).

PGW's preference for Specialists and Work Dispatchers, the second of the facially neutral policies Byrd identifies, has a clear business justification.  Even if a given employment action results in a disparate impact on a protected class, an employer can justify a facially neutral policy if the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A).  To evoke this business necessity defense, an employer must show the offending practice "to be necessary to safe and efficient job performance to survive a Title VII challenge." <u>Lanning v. Se. Pennsylvania Transp. Auth. (SEPTA)</u>, 181 F.3d 478, 489 (3d Cir. 1999) (quotations omitted).  Discriminatory tests are nonetheless valid when they are "predictive of ... important elements of work behavior which comprise ... the job ... for which candidates are being evaluated." <u>Id</u>.

PGW's interviewing process was designed to assess the "important elements of work behavior"—i.e., each candidate's technical prowess and managerial experience—for a position that required both technical and managerial skills.  While not a requirement for Supervisors to first advance through the ranks to the managerial position of Specialist, the Supervisor job description clearly lists "leadership skills," the "ability to supervise others," and "project planning and

management skills" as essential qualifications for the role.  Def. Mot. Summ. J. at Ex. 9.  According to PGW's Job Evaluation Analysis (which is akin to an official job description), Specialists are chiefly responsible for training personnel and submit training reports regarding the staff they manage.  Def. Mot. Summ. J. Ex. 4.  They also "act in an advisory capacity" for the work orders and servicing problems assigned to the team working beneath them.  Id. Specialists are not, as Byrd describes, mere Service Persons with additional HVAC training.  In addition to the extensive training and managerial duties, the Specialist role also requires a more in-depth understanding of appliances and customer relations.  Id.  Similarly, Work Dispatchers work closely with Supervisors and share many of their same duties. Compare Pl. Opp'n Summ. J. Ex. A to Ex. B (noting that both positions require coordinating services and emergency repairs, drafting monthly reports to upper-level management, handling customer issues, and crafting external incident reports for police, insurance agencies, and other individuals). Work Dispatchers are involved with dispatching resources for approximately eighty jobs a day and are consequently exposed to many more experiences than a Service Person on a daily basis. See Def. Mot. Summ. J. Ex. 6 at Delgado Tr. 143:23-24.

While Byrd and the other Serviceperson applicants may have been more competitive within a pool of applicants without managerial experience, they were instead competing against multiple high-ranking employees with years of experience in management. Indeed, there were multiple Hispanic and African American candidates with managerial experience who were interviewed and ranked higher than him in the evaluation process.  Two of these candidates—one Hispanic and one African American Specialist—received job offers.

## VII.   <u>Conclusion</u>

The undisputed evidence does not support Plaintiff Byrd's proprietary claim of disparate

impact.  Defendant's Motion for Summary Judgment (Dkt. No. 22) will be **GRANTED**. An

appropriate order follows.

O:\CIVIL 19\19-5305 Byrd v Phila Gas Works\19-cv-5305 Byrd v. PGW SJ Memo.docx